

**BC**

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]



RECEIVED KG
7/22/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

Ariel Volpert

_____

Plaintiff(s),

v.

Lurie children's

Hospital

_____

Defendant(s).

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case Number: _____

1:25-cv-08525
Judge Franklin U. Valderrama
Magistrate Judge Jeffrey T. Gilbert
Cat 2 Random Assignment

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

1. This is an action for employment discrimination.

2. The plaintiff is Ariel Volpert _____ of the

county of Will _____ in the state of Illinois .

3. The defendant is Lurie children's Hospital _____, whose

street address is 225 E. Chicago Ave. Box 241 ,

(city) Chicago (county) Cook (state) IL (ZIP) 60411

(Defendant's telephone number) (312) – 224-4000 or 312-227-7124

4. The plaintiff sought employment or was employed by the defendant at (street address)

225 E. Chicago Ave (city) Chicago

(county) Cook (state) IL (ZIP code) 60611

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

5.  The plaintiff [*check one box*]

    (a)  ☐  was denied employment by the defendant.

    (b)  ☒  was hired and is still employed by the defendant.

    (c)  ☒  was employed but is no longer employed by the defendant.

6.  The defendant discriminated against the plaintiff on or about, or beginning on or about, (month)____11____, (day)__28__, (year)_2022_.

7.1  *(Choose paragraph 7.1 or 7.2, do not complete both.)*

    (a)  The defendant is not a federal governmental agency, and the plaintiff [*check one box*] ☒*has* ☐*has not* filed a charge or charges against the defendant asserting the acts of discrimination indicated in this complaint with any of the following government agencies:

        (i)  ☒ the United States Equal Employment Opportunity Commission, on or about

            (month)_____5_____ (day)_17___ (year)_'23_.

        (ii)  ☒ the Illinois Department of Human Rights, on or about

            (month)_____5_____ (day)_17___ (year)_23_.

    (b)  If charges *were* filed with an agency indicated above, a copy of the charge is attached. ☒ Yes, ☒ No, **but plaintiff will file a copy of the charge within 14 days.**

    It is the policy of both the Equal Employment Opportunity Commission and the Illinois Department of Human Rights to cross-file with the other agency all charges received. The plaintiff has no reason to believe that this policy was not followed in this case.

7.2  The defendant is a federal governmental agency, and

    (a)  the plaintiff previously filed a Complaint of Employment Discrimination with the

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

2

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

defendant asserting the acts of discrimination indicated in this court complaint.

☒ Yes (month)_____ (day)_____ (year) _____

☐ No, did not file Complaint of Employment Discrimination

(b) The plaintiff received a Final Agency Decision on (month)_____

(day) _____ (year) _____.

(c) Attached is a copy of the

(i) Complaint of Employment Discrimination,

☐ Yes ☐ No, but a copy will be filed within 14 days.

(ii) Final Agency Decision

☐ Yes ☐ N0, but a copy will be filed within 14 days.

8. *(Complete paragraph 8 only if defendant is not a federal governmental agency.)*

(a) ☐ the United States Equal Employment Opportunity Commission has not

issued a *Notice of Right to Sue.*

(b) ☒ the United States Equal Employment Opportunity Commission has issued

a *Notice of Right to Sue,* which was received by the plaintiff on

(month)_____ 0 4 ' (day) 2 4 (year) 2 5 a copy of which

*Notice* is attached to this complaint.

9. The defendant discriminated against the plaintiff because of the plaintiff's [*check only*

*those that apply*]:

(a) ☐ Age (Age Discrimination Employment Act).

(b) ☐ Color (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

3

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

(c) ☑ Disability (Americans with Disabilities Act or Rehabilitation Act)

(d) ☐ National Origin (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(e) ☐ Race (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).

(f) ☐ Religion (Title VII of the Civil Rights Act of 1964)

(g) ☐ Sex (Title VII of the Civil Rights Act of 1964)

10. If the defendant is a state, county, municipal (city, town or village) or other local governmental agency, plaintiff further alleges discrimination on the basis of race, color, or national origin (42 U.S.C. § 1983).

11. Jurisdiction over the statutory violation alleged is conferred as follows: for Title VII claims by 28 U.S.C.§1331, 28 U.S.C.§1343(a)(3), and 42 U.S.C.§2000e-5(f)(3); for 42 U.S.C.§1981 and §1983 by 42 U.S.C.§1988; for the ADA by 42 U.S.C.§12117; for the Rehabilitation Act, 29 U.S.C. § 791; and for the ADEA, 29 U.S.C. § 626(c).

12. The defendant [*check only those that apply*]
   (a) ☐ failed to hire the plaintiff.

   (b) ☑ terminated the plaintiff's employment.

   (c) ☐ failed to promote the plaintiff.

   (d) ☐ failed to reasonably accommodate the plaintiff's religion.

   (e) ☑ failed to reasonably accommodate the plaintiff's disabilities.

   (f) ☐ failed to stop harassment;

   (g) ☑ retaliated against the plaintiff because the plaintiff did something to assert rights protected by the laws identified in paragraphs 9 and 10 above;

   (h) ☐ other (specify): _____

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

4

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

_____

_____

_____

_____

13.  The facts supporting the plaintiff's claim of discrimination are as follows:

please see the EEOC charge w/ supporting evidence.

12/13/23 - ADA paper work is finished, 83 days until I'm allowed to start my position 3/8/23, 4/7/23 "Tired of accommodation you" 4/8/23 ECoC complaint, 4/27/23 terminated. 4/11/23 manager cancels ariel's class. Failure to reasonably accommodate and retaliation.

14.  **[AGE DISCRIMINATION ONLY]** Defendant knowingly, intentionally, and willfully discriminated against the plaintiff.

15.  The plaintiff demands that the case be tried by a jury. ☑ Yes ☐ No

16.  THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

(a)  ☐ Direct the defendant to hire the plaintiff.

(b)  ☐ Direct the defendant to re-employ the plaintiff.

(c)  ☐ Direct the defendant to promote the plaintiff.

(d)  ☐ Direct the defendant to reasonably accommodate the plaintiff's religion.

(e)  ☐ Direct the defendant to reasonably accommodate the plaintiff's disabilities.

(f)  ☑ Direct the defendant to (specify): pay the cover sheet "demand", issue an apology, and provide ADA training to all the staff.

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

5

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

_____

_____

_____

(g)  ☑ If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h)  ☑ Grant such other relief as the Court may find appropriate.


_____Ariel Volpert_____
(Plaintiff's signature)

_____Ariel Volpert_____
(Plaintiff's name)

_____19653 W. Schweitzer Rd_____
(Plaintiff's street address)


(City)___Joliet___ (State)___IL___ (ZIP)___60436___


(Plaintiff's telephone number) (847) – ___271-4001___


Date: ___7/12/25___


[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/27/2016

6

# Lurie Children's Hospital

**Discrimination on the basis of: disability, perceived disability, record of disability.**

**Failure to reasonably accommodate, explore reasonable accommodations, and retaliation.**

8/15/23

# Ariel Volpert

**Incident:**

- 4/8/23 EEOC – IIG
  - 230-408-000110
- 4/8/23/ EEOC – IIG
  - 230408-000108

**Inquiry:**

- 5/7/23: 440-2023-06576
- 7/23/23: 440-2023-08508

# Overview

- Summary and Timeline
- ADA and Reasonable Accommodations
- Observation Request and EEOC Complaint
- Spoliation and Logic
- Termination and Timeline Review



# Summary

# Summary

Ariel was terminated two and a half weeks after filing a complaint with the EEOC. Lurie Children's Hospital had a large, organization-wide initiative to bring everyone back to the office *three* days a week. During this time, more organizations were requiring employees to come back to the office for a "hybrid" schedule. Many employees were resisting going back to the office. After Ariel's new-hire employee health exam, she disclosed a medical condition to her boss, Lisa, and was told to seek accommodations through their formal process (11/14/22). Employee health, overseeing that process and the request, denied it (2/24/23). For reasons contained herein, this resulted in a discriminatory outcome. 83 days after Ariel's request, she is finally permitted to start work (3/8/23). Approximately one month after starting, Lisa makes a discriminatory and retaliatory comment against Ariel, stating that she was tired of accommodating her (4/7/23). Ariel files a complaint with the EEOC the next day (4/8/23). Lurie's becomes aware that Ariel filed an EEOC complaint through the EEOC's automatic notification system and also through Ariel via email on 4/11/23. Ariel's class is then canceled (4/11/23), some of her emails are deleted, and fake error messages are planted. Subtracting out of office time for bereavement, eight business days after her EEOC complaint – Ariel is terminated (4/27/23).

# Timeline

# Timeline of Events



# ADA and Reasonable Accommodations

# § 1601.15 (para. b) Sections 1-3

**Harm:** Discrimination – denial of reasonable accommodations; physical, psychological, and social harm.

**Date:** 2/23/2023

**Act:** Title VII - ADA Discrimination

**Statement of the Facts:** Slides 10-22 with accompanying documents, photos, and emails.

# ADA and Reasonable Accommodations

11/8/22 – Ariel attends her mandatory, confidential, third-party pre-hire health screening and drug test.

11/10/22 – On the good-faith counsel of Lurie's third party, confidential health advocate (Dr. Meredith Belber), Ariel decides to discuss her fever of unknown origin (FUO) diagnosis with her boss, Lisa Fitterer.

11/14/22 – Lisa writes, "…we need to follow a formal process," and asks her to apply for reasonable accommodations . Ariel obliges.  **Fitterer, Lisa M [lfitterer@luriechildrens.org](mailto:lfitterer@luriechildrens.org)** Mon, Nov 14, 2022, 3:11 PM

11/14-12/13/22 – Ariel's doctor's office (in Atlanta, GA) has difficulty sending the documents to and getting a response from Lurie's, despite Ariel regularly following up with both parties.

12/13/22 – Ariel's paperwork is fully completed and submitted.

83

# 83 DAYS

- 2/23/23 – Ariel's accommodation request is denied.

- 83 days from when Ariel's paperwork is completed until she is allowed to start work on 3/8/23.

- During this time Ariel was:
  - Without pay
  - Without health insurance
  - Not sure if she had a job
  - Unable to get responses from employee health (Merardo and Andrea)
  - Extremely anxious and concerned
  - Worried about finances

# Questions and Answers

What is a fever of unknown origin (FUO)? What does this mean specifically for Ariel?



https://docs.google.com/document/d/1DHZQr1G7ZuBqyfsFQHZIWR6_9Z5Aa5R3A_3i5Gcv0Tk/edit?usp=sharing

# Questions and Answers

What was taking so long?



Click the question mark

https://docs.google.com/document/d/1xcWc8
3kMxMCU7pP1EidAuF6X2w5UBfJxxgJPF6yncy
w/edit?usp=sharing

# Questions and Answers

What specific accommodations did Ariel request?



Click the question mark

https://docs.google.com/document/d/1zpbl7h
Wl7uvcSBVWMmEbbAm12Wi3M6WcA7KiyTOt
q54/edit?usp=sharing

# Questions and Answers

Why was Ariel's accommodation request denied?



Click the question mark

https://docs.google.com/document/d/1OR20QaBYDWr17VrnFSinUNOoMp-IlpZH0QsiHpVO9x8/edit?usp=sharing

# Questions and Answers

What was Ariel's response the denial?



Click the question mark

https://docs.google.com/document/d/153htl6
9dD4Q4I8ETzf6b1cmjaBvvTIusisvZsDnXfEo/edit
?usp=sharing

# Questions and Answers

What was the organization's response to my concerns?

*Almost one month later, two business days after my EEOC complaint.



Click the question mark

https://docs.google.com/document/d/1XoJ0YJX6zZfr23PVEVR5rxtxHSHXmZkw3nSqch8tU1M/edit?usp=sharing

# Reasonableness of Requested Accommodation

At *no* time was Ariel ever in an in-person meeting, in a conference room, with a group of people to take a meeting.

*All* project meetings she participated in, were done via computer using "Teams", individually, and at her desk or in a small, unused office.

Ariel and her boss, Lisa, were on the 12th floor. Lisa's boss, Mary Alida Brisk, was on the 13th floor. At *no* time did Ariel ever observe Mary Alida on the 12th floor.

Prior to Ariel's hire, a contractor performed Ariel's job. With exception to in-person classes or activities (requiring Ariel to be hired), all other work was being performed remotely by the contractor in Atlanta, Georgia.

# Reasonableness of Requested Accommodation Cont'd

✓ The FUO would not/did not stop Ariel from being able to perform the essential functions of her position.

✓ The request was reasonable and did not cause undue hardship on the organization. The accommodations were able to be made.

✓ She is not contagious, and the organization was aware of that.

✓ The organization's denial letter and responses were inaccurate, unethical, and resulted in a discriminatory outcome.

✓ The process was not "interactive".

✓ It took 83 days, unpaid and scared, for Ariel to start working.

# Reasonableness of Requested Accommodation Cont'd

From the very beginning, the organization was set on three days in the office per week, with no consideration for extenuating circumstances or people with disabilities.

- Per Lisa's email:
- **Fitterer, Lisa M lfitterer@luriechildrens.org**  Dec 11, 2022, 7:48 PM
  - on 12/11/22 - "remote probably two days a week is best case scenario".
  - Before knowing anything, they had *already determined* what they wanted and how things would be.

The organization treated Ariel as though she was trying to turn a hybrid position into a fully remote position, when in fact, she had a very real health issue and was trying to protect her body, and in doing so, protect her job performance.

- Per Merardo's call on 1/30/23, "So let's be real, how many remote days are we talking, Ariel?".

# Questions to Consider

- Was the request handled in a timely manner?

- Were the reasons listed in the denial letter fair, accurate, ethical?

- Did Lurie's fail to follow-up with any medical questions it had?

- Was the process "interactive"?

- Did the denial letter fail to meet EEOC/federal requirements by not listing the EEOC as a further course of action in their denial letter?

- Has the organization met its burden of proof that the requested accommodation would have created an "undue hardship"?

- Did the organization give Ariel the *individualized consideration* required by the ADA, or was the organization more focused on unilaterally requiring three in-office days regardless of circumstance or disability?

# Observation Request & EEOC Complaint

# § 1601.15 (para. b) Sections 1-3

**Harm:** Retaliation; psychological, physical and social harm.

**Date:** 4/7/2023 – 4/27/2023

**Act:** Title VII

**Statement of the Facts:** Slides 25-58 with accompanying documents, photos, and emails.

# Ariel Starts Her Position

3/8/23-4/6/23 - Everything is going great.

Ariel meets her new co-workers, is getting along well, and she and Lisa have a good relationship!

Lisa was consistently in the office 2-3 days a week.

Ariel followed her lead, and there were no issues with in-office attendance.

Lisa and Ariel's calendars were labeled each day for "on site" or "remote" to let others know when they would be in the building.

There were never any disagreements, verbal warnings, written warnings, or any other disciplinary action whatsoever.

Things are good.

# Observation Request

Due to the pandemic, almost all corporate training went "virtual".

Classes were taught using "Teams" and other virtual meetings spaces.

As a result, Ariel had not been physically in the classroom for 2.5 years.

4/7/23 - Ariel was all set, prepped, and ready to teach her first in-person class on 4/11/23. It was a small class of seven people.

On 4/7/23 - Ariel asked Lisa if she would mind observing a later session because she went through a brief period of panic attacks in 2018. She was hoping to get her feet wet before her new boss saw her teach/facilitate. She was nervous, but prepared and ready to go.

# Observation Request Cont'd

- On 4/7/23 – Lisa responded,

  "Why are you telling me this? I am so tired of accommodating you. No, accommodating isn't the right word."

- Ariel is taken aback. She responds to Lisa via text.

- 4/7/23 – Summarizing, Lisa says she will attend the session "for support". Ariel says okay.



# Observation Request & EEOC Complaint

4/8/23 – Ariel files a complaint with the EEOC.

4/10/23 – Ariel discovers she is no longer able to send emails from her work email to her personal email. She begins to document just in case.

4/10/23 – Lisa confirms, again, that she plans to attend the class. Paraphrasing, Ariel says that's okay. She's prepared. Lisa is invited.

4/11/23 – Lisa abruptly changes course, and says they should cancel the class.

4/11/23 - Ariel says "no, that's not necessary". She welcomes Lisa to attend.

# Observation Request & EEOC Complaint

4/8/23 – Ariel files a complaint with the EEOC.



# Observation Request & EEOC Complaint

4/10/23 – Ariel discovers she is no longer able to send emails from her work email to her personal email. She begins to document just in case.



# Observation Request & EEOC Complaint

4/10/23 – Lisa confirms, again, that she plans to attend the class.



# Observation Request & EEOC Complaint

4/11/23 – Lisa abruptly changes course, and says they should cancel the class.



# Observation Request & EEOC Complaint

4/11/23 - Ariel says "no, that's not necessary". She welcomes Lisa to attend.



# Observation Request & EEOC Complaint

4/11/23 – Lisa again insists that they cancel the class.

4/11/23 – Ariel again states that she's ready to teach, and Lisa is welcome to attend.

4/11/23 - Lisa again insists, for the third time, that they cancel the class.

4/11/23 – Ariel, for the third time, says that's not necessary and invites Lisa to attend. Ariel is afraid of more retaliation for speaking up.

4/11/23 – Lisa cancels the class and does not copy Ariel on the class cancellation email sent out to participants.

# Observation Request & EEOC Complaint

4/11/23 – For the second time, Lisa insists that they cancel the class.



# Observation Request & EEOC Complaint

4/11/23 – Ariel again states that she's ready to teach, and Lisa is welcome to attend. Ariel fears more retaliation for speaking up.



# Observation Request & EEOC Complaint

4/11/23 - For the third time, Lisa insists that they cancel the class.



# Observation Request & EEOC Complaint

4/11/23 – Ariel, for the third time, says that's not necessary and invites Lisa to attend.

4/11/23 – <span style="color:red">Lisa cancels the class</span> and does not copy Ariel on the class cancellation email sent out to participants.



# Spoliation

# Spoliation

What is spoliation?

- "Today, the term spoliation of evidence is often used during the process of civil litigation. It arises when one side suspects or uncovers that the other party has deliberately, negligently or accidentally destroyed evidence relevant to the case."

- Spoliated evidence can include:
  - physical objects
  - photographs
  - documents, and
  - electronically stored information "ESI"

  (Joneskell, 2023)

# Lurie's Intentionally Destroys Evidence

- Ariel continues to document through screenshots because she cannot forward her emails and is growing increasingly concerned, especially after her experience with employee health.
  - All emails saying Lisa would attend the class are deleted from her inbox.
  - All emails with Ariel saying the class does not need to be canceled and Lisa is invited are deleted from her inbox.
- Ariel requests more than *three* times for Lisa to please send her the missing emails that she received that Lisa sent. Lisa never sends the emails.
- 4/13/23 – Lisa reports that her computer, cell phone, and calendar have all crashed.
- During this time, Lisa meets with the legal team.

Ariel requests for Lisa to please send her the missing emails that she received that Lisa sent.

Lisa never sends the emails.



Ariel requests *a second time* for Lisa to please send her the missing emails that she received that Lisa sent.

Lisa never sends the emails.



Ariel requests a *third time* for Lisa to please send her the missing emails that she received that Lisa sent.

Lisa never sends the emails.



4/13/23 – Lisa reports that her computer has crashed.



4/13/23 – Lisa's changes her calendar permissions. Ariel is asks if this change is just for her. Now, Lisa begins to email the same massages to "the team". Ariel is now blocked from seeing Lisa's calendar appointments.



4/13/23 – Lisa's changes her calendar permissions. Ariel is now blocked from seeing Lisa's calendar appointments.



4/13/23 – Lisa reports to the team that her cell phone has crashed, now, to "the team".



# Lurie's Intentionally Destroys Evidence

- Some of Lisa's emails are replaced by fake red error messages.
- Instead of Ariel seeing Lisa's received emails, she now sees a message saying *Ariel's* "message cannot be sent".
- **The time stamp on the "error" messages should match the time stamp on the email retention policy *exactly*. It does not.**
- **The date stamp on the "error" messages should match the date stamp on the email retention policy exactly, minus two days. It does not.**
- This is incontrovertible proof that these error messages were phony and a *supreme* violation of ethics.
- When Ariel tells this to Lisa, the fake error messages are then also deleted.

# Normal E-mail Examples



# Normal Error Message



Some of Lisa's emails are replaced by fake red error messages.



*see next slide for details

**Please pay careful attention.**

- On every email, Lurie's has their seven year retention policy statement.
- The date on the retention notice is always two days behind.
- The time on the emails and the retention policy are *always* the same.
- In these fake red error messages, the time stamp on the fake error messages is DIFFERENT from the time stamp on the retention policy.
- In these fake red error messages, the date is *three* days behind.
- We can see in *every* other "normal" email or error message, these two rules are never broken.



Retention Statement: 4/08/2023 12:14pm

Email: 4/11/2023 7:45pm

# Lurie's Intentionally Destroys Evidence

- 4/14/23-4/21/23 - Ariel is out of the office for a week because her grandpa passes away.

- 4/27/23 – Ariel is terminated.

- 5/8/23 – Ariel checks her work email one last time post-termination. All emails after 4/8, the day of the EEOC complaint, are deleted.

- 5/8/23 - All of her calendar designations of "in office" or "remote" are deleted from her calendar.

- Ariel worked 8 days from the time of her EEOC complaint until she was terminated.

5/8/23 – Ariel checks her work email one last time post-termination.

All emails after 4/8, the day of the EEOC complaint, are deleted.



5/8/23 - All of Ariel's calendar designations of "in office" or "remote" are deleted from her calendar.





# Spoliation Logic

## If it was a technology issue:

- Why were the only emails deleted pertaining to these matters?
- Why weren't her other business emails lost? Or other calendar appointments deleted?
- Why did Lisa refuse to send the requested emails back?
- How do you explain the time and date stamps on the red error messages being different from the retention policy time and date stamps?

## If Ariel deleted the emails:

- Why is she showing us the screenshots?
- Why does she have pictures of emails directly asking Lisa to please forward her, her copies of the emails?

# Our Contention and Request

## Our contention:

- This was not an "accident" or a "technology issue".
- The organization intentionally destroyed, hid, and deleted evidence they thought would be damaging to them and had potential evidentiary value for Ariel.
- The organization should admit that they intentionally, very selectively destroyed evidence and/or kept that evidence from being available to Ariel.

## Requests:

- The server holds emails for seven years, even "deleted" emails. Show us the deleted emails.
- The operating system also tracks and logs "actions" like sending/deleting/forwarding emails. Show us the computer log so we can identify who deleted the emails and when.

# Termination

# § 1601.15 (para. b) Sections 1-3

**Harm:** Retaliation and Wrongful Termination; physical, psychological, social and economic harm.

**Date:** 4/27/2023

**Act:** Title VII

**Statement of the Facts:** Slides 61-66 with accompanying documents, photos, and emails.

# Lurie's Knew Ariel Went to the EEOC

Ariel Jaye <arieljaye@gmail.com>

Tue, Apr 11, 1:53 PM

to Merardo, Andrea

Hello,

I sent my email request 29 days ago on 3/13.

I hadn't heard back, so I filed a complaint with the EEOC on 4/8.

# Termination

Why was Ariel fired?



Click the question mark

https://drive.google.com/file/d/1NbdBUSj3Epv
FPkaQBQBFTd5UCfpEtgIo/view?usp=sharing

# Termination

What is the response to the termination letter?



Click the question mark

docs.google.com/document/d/1t0E5Km48fKU
WEK6M3JAqlTYr7d79sBnYfd8nB2j8Y3Y/edit?us
p=sharing

# Our Contention

These are not the *real* reasons Ariel was terminated.

Ariel was discriminated against, retaliated against, and then wrongfully terminated.

These reasons are a stretch and inaccurate.

Countless *intentional* acts of spoliation occurred to cover up the *true* reasons Ariel was terminated. These acts were intentional, malicious and harmful.

People who use words or phrases like shady, sketchy, dude, or shame on you are not normally terminated.  Ariel was treated *inconsistently* to other employees.

There were no verbal or written warnings. There were no meetings with HR. No disciplinary action was taken before she was terminated.

Ariel was terminated and retaliated against because she advocated for herself and filed a complaint with the EEOC.

# Timeline of Events



# Thank you for your time and consideration.

| To | Arieljaye@gmail.com 👤 Person 👤 Person 👤 Person |
|---|---|
| Cc | 👤 Person |
| Bcc | 👤 Person |
| Subject | EEOC compilation doc |

Wed, Feb 8,

3:21 PM

**Ariel Jaye <arieljaye@gmail.com>**

***Evidence, in order, according to the EEOC
CHARGE document.

What is a fever of unknown origin (FUO)? What does this mean
specifically for Ariel?  PAGE 13 of EEOC Charge

Nano and Andrea,

I run elevated core body temperatures and/or fevers with caloric expenditure (movement,
eating, and anything else that expends calories).

The more I move, the more frequently I run higher body temps/fevers.

Typically, this happens 6+ times a day. Each day and every day. When my body temperature
rises with movement, I get very hot. If it happens often, I run the risk of other symptoms
developing.

It is a very rare diagnosis. The specialists I've seen do not understand what is causing this problem. Because they don't know what's causing this, they can only refer to it as a diagnosis of "fever of unknown origin."

The specialists I've seen are a:

Hematologist

Infectious disease doctor

Cardiologist

Hepatologist

GI

Pulmonologist

ENT

Endocrinologist

Rheumatologist (they wanted to diagnose me w atypical fibromyalgia)

Neurologist

Allergist

I've had every part of my body imaged…MRI's, CT scans, and X-rays. I've had over $100k worth of blood drawn. I have been through several "exploratory procedures."

I remain a "medical mystery." No one can say if this condition is temporary or chronic because no one knows what's causing it.

I have been through A LOT.

This organization requested I go through a formal process. I obliged because I thought it was a good idea to be formal if the organization wanted to be formal about it.

Since formality was requested by the organization, all I have EVER asked was to be recognized as having this issue and for physical movement to be limited to essential functions by being discerning about when it is needed for me to be in the office. That's it. That's all.

The absolute lack of transparency, communication, and responsiveness by this department is highly upsetting. I've cried a lot of tears, been afraid for my position, lost a lot of time and income, and have been left in the dark for weeks on end. The way this entire situation has been handled has been completely unacceptable.

If you deem it appropriate to reject my ADA claim, then that is your professional judgment; others feel the requests are very reasonable.

In the case that you don't formally acknowledge my condition, I will go through the appeals process, and you can please provide your rejection letter and the appeals process to me now.

My fever of unknown origin is very real, and it deserves to be recognized as such.

I've been extremely compliant and patient with this department, its staff, the staff's personal issues, holiday schedules, and requests made of me. I've been diligent, timely, and respectful in all matters, even when others weren't.

I will do my onboarding, if needed, appeal your decision internally through y'all, and perform with excellence. I truly hope this department is not an accurate representation of how Lurie's treats their people especially as a healthcare organization.

Respectfully,

Ariel

—————————

## Clarification



Mon, Jan 30,
3:09 PM

**Ariel Jaye <arieljaye@gmail.com>**

What was taking so long? Page 14

 to Andrea, Lisa

Hi Andrea and Lisa,

I hope this email finds you both well.

Andrea, I was writing to see if there was any update or clarity that you could provide regarding the ADA process.

Lurie's requested additional information. That information was submitted four days later by my doctor's office on 1/11.

Since then, I've been reaching out at reasonable intervals to follow up, ask a few questions, and provide some additional information, but I can't seem to get ahold of you or Nano via phone or email.

I'm really dismayed by this experience; it's been very hard on me emotionally. I've been in the dark for weeks and weeks and weeks.

**To be honest, I'm not even sure what Lurie's believes was requested, because I never asked to be fully remote, and no one has had a conversation with me to drill down to any meaningful specifics. I've tried asking for clarity or a conversation, but have been unsuccessful with both points of contact. I literally don't even understand what's being considered, let alone for over two months. I feel confused, hurt and frustrated.**

I don't know what else to do at this point other than write and include both of you on this email for transparency.

I'm hoping for a response, resolution, or at least a clarifying conversation. Please let's find a resolution soon.

Thank you both for your time and consideration.

Best,

Ariel Volpert

...

_____

Wed, Feb 1,
10:42 PM

**Ariel Jaye <arieljaye@gmail.com>**

What specific accommodations did Ariel request? Page 15

 to Merardo, Andrea

Hi All,

Nano reached out to me the day I sent my last email. We had an extremely productive conversation. Thank you, Nano!

My action item was to get one additional piece of documentation from one of my previous specialists. I requested the documentation from the him directly after our call.

To re-cap a few things we discussed (and Nano please feel free to add or edit):

1. I'm not requesting a set number of days in or out of the office. I'm just raising awareness that physical movement can be difficult for me. I'm asking if we can please be discerning.

- To me, "discerning" means that I can absolutely be in the office for critical/essential in-office activities like trainings, train the trainers, the HR quarterly meetings, team consultations/dev., and other things that must be done in person.
- To me, discerning means not requiring me to be in office for things that can easily be done from home like meetings, project work, or cultivating peer relationships.
- I would say discerning means giving me the opportunity to make bigger virtual training lifts when possible or just asking, "is this something small that someone more able-bodied can do, and Ariel can do something for them?" An example of that might be "rounding."

2. I discussed possibly needing flexibility for future doctor appointments.

3. One thing I forgot to request was just the flexibility to sit down or step outside for ten minutes if I get over-heated.

I hope those requests seem reasonable, and feel like a good path forward, one where everyone's needs are met.

Nano, thank you so much for your time the other day. I hope you'll proceed on your end.

I know that you had high hopes to get this finally wrapped up by the end of the week, and I feel super confident that we all feel the same way haha.

Finally, I'd like to be able to talk about some of these things with Lisa and help make sure she's comfortable. We haven't spoken much because we've both been waiting for this process to be completed.

- When will it be okay/best for us confer?
- Does anyone have any helpful information or tips on how to ensure we're well-aligned?
    - I haven't needed to have a formal conversation or ongoing conversations like this before, so I'd definitely be grateful for any advice.

Thanks again, Nano.

Best,

Ariel

————-



<span style="color:red">Why was Ariel's accommodation request denied? Page 17</span>

February 23, 2023

Ariel Volpert
1125 Troost Ave
Forest Park, IL 60613

Dear Ariel:

During your post-offer Corporate Health screening on November 18, 2022, you requested an accommodation under the Americans with Disabilities Act (ADA) for remote work at minimum of three days per week or as needed due to a flare up of your health condition. This letter summarizes the information shared during the interactive process to determine whether your condition qualifies as an ADA disability, and, if so, whether your request could be reasonably accommodated.

After your request, we asked for some additional information about your condition and the circumstances in which you were requesting to work remotely. The information provided by your physician dated December 12, 2022, did not identify the major life activities that are substantially limited by your health condition. We therefore requested some additional follow up, although the substantial limitations have not yet been identified.

You also shared that you suffer from fevers approximately 6x day. As a pediatric health care provider that serves critically ill children, our policy prohibits anyone from working onsite while febrile; based on your representations, you would therefore be unable to work onsite every day. We do not believe that exempting you from our policy and assuming your fevers are related to your current condition and are not associated with COVID or some other transmissible illness, provides sufficient protection for our patients and staff.

As was shared with you during the interview process and after the offer, onsite work is an essential job function of this position. Educational sessions, listening sessions, ad hoc consults, "brown bag" lunch events, team facilitation and other activities need to be performed in person. As we understand your request, you would like the ability to work at home any time your condition "flares up" and, due to our policy of prohibiting onsite work while febrile, you would likely be unable to work onsite nearly every day.

Based upon our review of the information you've shared, we do not believe that working remotely whenever requested and, likely daily, is a reasonable accommodation since it would not allow you to complete the essential job functions listed above.

**Human Resources / Employee Health Services**

225 East Chicago Avenue, Box 281, Chicago, Illinois 60611 | 312.227.6430



Ann & Robert H. Lurie
Children's Hospital of Chicago

If you have any additional information you would like us to consider or have any

questions  regarding this decision, please contact me as soon as possible.

Kind Regards,
Sincerely, Nano Villarreal
Manager of Absence & Employee Wellbeing**Human Resources / Employee Health Services**

225 East Chicago Avenue, Box 281, Chicago, Illinois 60611 | 312.227.6430
_____



Mon, Mar 13,
11:20 AM

**Ariel Jaye <arieljaye@gmail.com>**

What was Ariel's response to the denial? Page 18

Andrea and Nano,

This is a response to the accommodation letter sent on 2/13/23 and received at 2:45pm CST.

The decision summary I received was an almost fully inaccurate representation of our phone conversations, emails, and exchanges.

Beyond that, there is a fundamental disagreement on whether I'm entitled to protection under the law through the ADA.

This response will contain two key items:

1. Direct responses to the inaccuracies, inconsistencies, and even just poor logic in your summary.

2. Additional questions for the department, as part of the interactive process, to be answered in writing.

1. Below is your response, and my concerns are highlighted in blue.

During your post-offer Corporate Health screening on November 18, 2022, you requested an accommodation under the Americans with Disabilities Act (ADA) for remote work at minimum of three days per week or as needed due to a flare up of your health condition. This letter summarizes the information shared during the interactive process to determine whether your condition qualifies as an ADA disability, and, if so, whether your request could be reasonably accommodated.

I met with corporate health on 11/10 per Dr. Meredith's write-up, which I have a signed and dated copy of. We spoke about my health issue. I was told by the doctor that our conversation was confidential.

The doctor asked me what might be helpful. I spoke off the cuff. I said 2 days in office because Lisa mentioned that "no one was in the office on Friday," and I had hoped not to push my body two days in a row, unless it was for essential reasons. At no time was I under the impression or told that this would be a formal ADA request or even that it would be shared.

On the advice of that same corporate health doctor, I then reached out to my boss, Lisa, on 11/10. I was hoping we could work together (informally) to find work-arounds if I needed understanding. I did not request formal accommodations.

On 11/14 Lisa requested I go through a formal process by saying, "we need to follow a formal process".

I obliged.

That was the first mention of going through the formal ADA process. It was requested by the organization.

The more I experienced from the employee health department, the more clear it became that I should have protections because the department was engaging in a number of concerning ways: only wanting to talk on the phone, not responding to emails for lengthy periods of time, misrepresenting information, not understanding information, asking for additional information (then canceling the request), this supremely inaccurate letter, and more.

After your request, we asked for some additional information about your condition and the circumstances in which you were requesting to work remotely.

The document my doctor submitted on 12/12 asks for remote flexibility. That remote flexibility was later detailed over the phone in several conversations and through email that it meant being "discerning."

On 1/30 I sent this email expressing my confusion over what was actually being discussed or considered (let alone for so long):

"To be honest, I'm not even sure what Lurie's believes was requested, because I never asked to be fully remote, and no one has had a conversation with me to drill down to any meaningful specifics. I've tried asking for clarity or a conversation, but have been unsuccessful with both points of contact. I literally don't even understand what's being considered, let alone for over two months. I feel confused, hurt and frustrated.

I don't know what else to do at this point other than write and include both of you on this email for transparency.

I'm hoping for a response, resolution, or at least a clarifying conversation. Please let's find a resolution soon."

 - - -

After we spoke on the phone on 2/1, I wrote to you a re-cap email that day:

"To re-cap a few things we discussed (and Nano please feel free to add or edit):

1. I'm not requesting a set number of days in or out of the office. I'm just raising awareness that physical movement can be difficult for me. I'm asking if we can please be discerning.

- To me, "discerning" means that I can absolutely be in the office for critical/essential in-office activities like trainings, train the trainers, the HR quarterly meetings, team consultations/dev., and other things that must be done in person.
- To me, discerning means not requiring me to be in office for things that can easily be done from home like meetings, project work, or cultivating peer relationships.
- I would say discerning means giving me the opportunity to make bigger virtual training lifts when possible or just asking, "is this something small that someone more able-bodied can do, and Ariel can do something for them?" An example of that might be "rounding."

2. I discussed possibly needing flexibility for future doctor appointments.

3. One thing I forgot to request was just the flexibility to sit down or step outside for ten minutes if I get over-heated."

Despite asking you to edit or add, I never received a response from either you or Andrea.

The information provided by your physician dated December 12, 2022, did not identify the major life activities that are substantially limited by your health condition.

The documentation sent on 12/12 listed the major life activities that are impacted as such:



We therefore requested some additional follow up, although the substantial limitations have not yet been identified.

The additional information you requested was not about my limitations (see above), but rather, whether the condition was chronic or non chronic (see below).

Do you consider the patient's condition to be temporary or non-chronic?

____ YES _✗_ NO  _unknown at this time, needs further eval w/_
_Specialists_

Is the patient unable to perform one or more of the essential functions of his/her position as a result of the condition, disorder, etc. (Please refer to the job description or other information provided by the employer regarding the essential functions of the patient's job)?

I expressed many times that no one could say whether the condition was chronic or not chronic, because the cause of the condition is unknown. This was mentioned more than once.

On 2/8 I wrote:

"The specialists I've seen do not understand what is causing this problem. Because they don't know what's causing this, they can only refer to it as a diagnosis of "fever of unknown origin." It continues, "No one can say if this condition is temporary or chronic because no one knows what's causing it."

My doctor wrote this in his initial response that was submitted on 12/13:

Do you consider the patient's condition to be temporary or non-chronic?

____ YES _✗_ NO  _unknown at this time, needs further eval w/_
_Specialists_

Is the patient unable to perform one or more of the essential functions of his/her position as a result of the condition, disorder, etc. (Please refer to the job description or other information provided by the employer regarding the essential functions of the patient's job)?

You also shared that you suffer from fevers approximately 6x day. As a pediatric health care provider that serves critically ill children, our policy prohibits anyone

from working onsite while febrile; based on your representations, you would therefore be unable to work onsite every day. We do not believe that exempting you from our policy and assuming your fevers are related to your current condition and are not associated with COVID or some other transmissible illness, provides sufficient protection for our patients and staff.

On 1/30 we spoke for 50:11. You mentioned concerns about contagion, which was a completely reasonable concern.

I assured you that after 2.5 years of fevers that I was not contagious, it had been ruled out extensively early on in my medical history, and that I could provide you documentation from an infectious disease doctor from Emory University who would vouch for this.

I wrote to him on 1/30. I have those emails. He requested a visit since it had been a year since I had seen him. That would have pushed things out another two weeks (minimum), and I had already waited to start my position for almost three months at this point.

On 2/2, I told you this during a phone conversation that lasted for 13:29 that this would delay my start date even further, cause me continued economic hardship, and asked if it was really necessary.

On 2/2, you said it was not necessary.

I then wrote to my doctor to apologize and said that the organization said it was no longer necessary. I have that email to him as well.

We ended our conversation on 2/2 with you saying it wasn't necessary. I was happy because I didn't want to wait longer, and you seemed satisfied with the information provided.

Furthermore, and perhaps MOST importantly, if you still have concerns over contagion, then why would you allow me to work at all? ...with or without accommodations? It seems to me that if the organization was really concerned about this, then they would not allow me to work in the office at all. I don't understand this.

As was shared with you during the interview process and after the offer, onsite work is an essential job function of this position. Educational sessions, listening sessions, ad hoc consults, "brown bag" lunch events, team facilitation and other activities need to be performed in person.

I understand the need to be in-office for essential job functions. I've only asked that the organization commit to being "discerning" (in office for essential functions, but not for things like meetings, birthdays, or anything else that could easily be done from home etc., per my emails/our phone conversations) and to rightfully recognize me under the ADA.

I started out with an informal request, was then asked by my boss to go through a formal process, agreed, and now...unfortunately…three months later…I feel that protection is needed now more than ever based on the way this department has handled this situation.

The emotional turmoil, economic toll, and anxiety that I've experienced throughout these months, has also been documented in my writing to you, Nano, and you, Andrea. Those sentiments were expressed in earnest and in good faith.

I've never experienced anything like this in my work history before. Ever.

As we understand your request, you would like the ability to work at home any time your condition "flares up" and, due to our policy of prohibiting onsite work while febrile, you would likely be unable to work onsite nearly every day.

If that is how you understood my request, then you willfully did not understand it. I've communicated with you regularly, clearly, and transparently.

I've said many, many times that this is not about the number of days spent working from home.

I've certainly never asked to work from home "at any time".

Finally, if you're truly concerned about me being "febrile" or contagious, then why would you ever allow me to work in-office at all?

That concludes my/our response to the inaccuracies, misrepresentations, and in some cases, outright untruthful and unethical statements contained throughout this response.

2. Additional questions:

1. Would you like a written note from my infectious disease doctor?
2. Is there any other information I can provide you with that would help you reconsider your decision?
3. Do you have any alternative resolutions to help me protect my health and my job performance?
4. Do you have any additional questions or concerns that I can address?
5. What is your appeal process?

This summary is not supported by fact, documentation, truth, or transparency.

The representation portrayed here is not even remotely close to an accurate representation of our conversations, emails and interactions.

I hope you will reconsider your decision, or please provide me with the formal appeal process.

Respectfully,

Ariel Volpert

————-



What was the organization's response to my concerns and my response to them? Page 19

Apr 11, 2023, 9:38 AM

to me, Andrea

Dear Ariel,

Thank you for your patience in awaiting my response.  Please note that, although I have not responded to each item below or rehashed prior communication, this should not be interpreted as an agreement with all of your claims.  Rather, I am attempting to move the process forward in a constructive manner.

We understand that you commonly experience fevers and that you don't believe you have any contagious conditions when the fevers arise; however, as previously noted, as a pediatric health care provider providing care to critically ill children, we cannot assume that your fevers are never the result of a contagious infection.  Therefore, our position remains that you cannot work onsite while febrile.  You have suggested that you should be allowed to work remotely whenever you're febrile; however, we have consistently indicated that onsite work is an essential job

function and have explained the reasons for this job expectation.  My recollection of our call on 2/2 was that you were disappointed in our findings with respect to your request for remote work, and that you needed to weigh the decision whether to move forward.

We are willing to review any additional information you think is relevant to this discussion; however, in the absence of any new information, our prior determination stands.  We do not have an appeal process for our determination.

Please let me know if you have any further questions.

Best,

Nano Villarreal

Manager of Absence & Employee Wellbeing

Ann & Robert H. Lurie Children's Hospital of Chicago

T 312.227.6438 |  F  312.227.9448  |  mevillarreal@luriechildrens.org  |  luriechildrens.org

———-

Why was Ariel fired? Page 63

April 27, 2023

Ariel Volpert

1125 Troost Ave

Chicago, IL 60130

Dear Ariel,

You began your employment on March 6, 2023, with Ann & Robert H. Lurie Children's Hospital of Chicago as a Senior Organizational

Effectiveness Consultant in the Clinical and Organizational Effectiveness department. Our staff and leadership have been working with

you during your introductory period to facilitate your transition into the role and organization. However, your interpersonal interactions and

the way you have chosen to communicate to staff and leadership is not in alignment with the Lurie Children's Core Values and Code of

Conduct expectations of respectful and collaborative communication. This has impacted your training; professional relationships and your

work performance as follows:

• During the week of 3/13/23 we discussed you facilitating a Strength Finders training event. You chose 4/11/23 to host the event to

give you time to prepare. I communicated to you my plans to attend and observe your first-time facilitation. As a new hire this would

provide me the opportunity to assess your presentation/formal communication skills, strengths and progress and share constructive

feedback to support your development. On 4/7/23 at approximately 4:30 pm you requested that I do not attend the Strength Finders

session. In previous conversations, you indicated you have done these sessions multiple times but asked that I not attend your

session since it would make you nervous. As your leader, I offered two alternatives: dry runs or have me participate in the session

virtually to increase your confidence in presenting; you declined either option. This resulted in the cancellation of the session on the

morning of 4/11/23.

• You have sent numerous emails that have been aggressive, rude, and unprofessional, including the following comments: "I liked you";

"'m not getting into it w you or your helpfulness"; referring to me as "shady" and "sketchy" and saying I can't admit fault. You also

emailed an Employee Health representative, stating "Shame on you" in response to his attempt to answer your questions.

• You have also made false accusations on numerous occasions suggesting I deleted your emails, then you stated you would "not be

discussing anything related to any of these issues" with me, my boss, or her boss, and emailed me, stating "send me every email you

sent me on 4/11. No confusion there." You also indicated you do not want to be in the same room with me.

• You referred to the Chief Talent and Learning Officer, who identifies as female, as "dude."

Our Service Principles are expectations for how we partner with our patients, families, and coworkers; and al those with whom we come in

contact. They are an essential part of our Vision, Mission and the Patient and Family-Centered Care we provide. Accordingly, to ensure

excellence and provide the best possible work environment, the hospital expects employees to conduct themselves in ways that meet our

standards of performance, demonstrate our core values and service principles, and abide by our communication standards of conduct.

Your communication has not only been inconsistent with how we expect employees to treat others, but it has also been ineffective. One of

the goals of our department is to encourage and teach staff to utilize effective means of communication, and you have demonstrated an

inability to fulfill this expectation.

Ariel, due to your repeated failure to adhere to Lurie Children's Hospital Core Values and Code of Conduct during your 90 Day Introductory

Period, your employment with Lurie Children's Hospital wil terminate effective today, April 27, 2023.

Your benefits coverage wil end on the last day of the month or April 30, 2023. Information regarding COBRA wil be mailed to you.

Sincerely,

L a r i e e F l

Sr Director Organizational Effectiveness & Change Management

225 East Chicago Avenue, Chicago, Illinois 60611 | 312.227.4350 | luriechildrens.org

Ann & Robert H. Lurie Children's Hospital of Chicago Foundation / Stanley Manne Children's Research Institute

_____

What is the response to the termination letter? Page 64

Ann & Robert H. Lurie Children's
Hospital of Chicago®

April 27, 2023
Ariel Volpert 1125 Troost Ave Chicago, IL 60130

Dear Ariel,
You began your employment on March 6, 2023, with Ann & Robert H. Lurie Children's Hospital of Chicago as a Senior Organizational Effectiveness Consultant in the Clinical and Organizational Effectiveness department. Our staff and leadership have been working with you during your introductory period to facilitate your transition into the role and organization. However, your interpersonal interactions and the way you have chosen to communicate to staff and leadership is not in alignment with the Lurie Children's Core Values and Code of Conduct expectations of respectful and collaborative communication. This has impacted your training; professional relationships and your work performance as follows:

- During the week of 3/13/23 we discussed you facilitating a Strength Finders training event. You chose 4/11/23 to host the event to give you time to prepare. I communicated to you my plans to attend and observe your first-time facilitation. As a new hire this would provide me the opportunity to assess your presentation/formal communication skills, strengths and progress and share constructive feedback to support your development. On 4/7/23 at approximately 4:30 pm you requested that I do not attend the Strength Finders session. In previous conversations, you indicated you have done these sessions multiple times but asked that I not attend your session since it would make you nervous. As your leader, I offered two alternatives: dry runs or have me participate in the session virtually to increase your confidence in presenting; you declined either option. This resulted in the cancellation of the session on the morning of 4/11/23.

Lisa canceled the class. She was told five times that Ariel was prepared and Lisa was invited. Lisa canceled the class herself and did not copy Ariel on the email.

- You have sent numerous emails that have been aggressive, rude, and unprofessional, including the following comments: "I liked you"; "I'm not getting into it w you or your helpfulness"; referring to me as "shady" and "sketchy" and saying I can't admit fault. You

also emailed an Employee Health representative, stating "Shame on you" in response to his attempt to answer your questions.

Ariel referred to the *situation* as "shady" and "sketchy". She never called Lisa "shady" or "sketchy". Ariel stated that as a matter of fact.



Ariel did say, "shame on you" to employee health when she represented herself and her rights as a human being, she was not speaking as an employee engaged in a work project.

Lisa consistently used "the f word" and other swear words at work. Ariel was treated *inconsistently* with other similarly-situated employees.

- You have also made false accusations on numerous occasions suggesting I deleted your emails, then you stated you would "not be discussing anything related to any of these issues" with me, my boss, or her boss, and emailed me, stating "send me every email you sent me on 4/11. No confusion there." You also indicated you do not want to be in the same room with me.

Ariel never said Lisa deleted her emails. Ariel only asked why emails were being deleted from her inbox.



Ariel never said she did not want to "be in the same room" with Lisa. Ariel said she did not want to meet with Lisa *alone*.



- You referred to the Chief Talent and Learning Officer, who identifies as female, as "dude."

Ariel has a long history of professionalism. She has never been terminated before. She also has a long history of respecting the LGBTIQ+ community. Although used accidentally, "dude" is now also considered a unisex/gender neutral term (Webster's Dictionary, 2023).
Also, why did the organization never speak to Ariel about this prior to her termination?

Our Service Principles are expectations for how we partner with our patients, families, and coworkers; and all those with whom we come in contact. They are an essential part of our Vision, Mission and the Patient and Family-Centered Care we provide. Accordingly, to ensure excellence and provide the best possible work environment, the hospital expects employees to conduct themselves in ways that meet our standards of performance, demonstrate our core values and service principles, and abide by our communication standards of conduct. Your communication has not only been inconsistent with how we expect employees to treat others, but it has also been ineffective. One of the goals of our department is to encourage and teach staff to utilize effective means of communication, and you have demonstrated an inability to fulfill this expectation.

Ariel, due to your repeated failure to adhere to Lurie Children's Hospital Core Values and Code of Conduct during your 90 Day Introductory Period, your employment with Lurie Children's Hospital will terminate effective today, April 27, 2023.
Your benefits coverage will end on the last day of the month or April 30, 2023. Information regarding COBRA will be mailed to you.

Sincerely,
Lisa Fitterer
Sr Director Organizational Effectiveness & Change Management
225 East Chicago Avenue, Chicago, Illinois 60611 | 312.227.4350 | luriechildrens.org
Ann & Robert H. Lurie Children's Hospital of Chicago Foundation | Stanley Manne Children's Research Institute